*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Conservatorship of ELAINE JAYE.

CHRIS JAYE,

      Appellant,

v

KAREN L. JAYE, Conservator of ELAINE JAYE, a legally incapacitated person,

      Appellee.

UNPUBLISHED
January 24, 2019

No. 342195
Eaton Probate Court
LC No. 16-052296-CA

---

*In re* Guardianship of ELAINE JAYE.

CHRIS JAYE,

      Appellant,

v

KAREN L. JAYE, Guardian of ELAINE JAYE, a legally incapacitated person,

      Appellee.

No. 342197
Eaton Probate Court
LC No. 16-052239-GA

---

Before: BOONSTRA, P.J., and SAWYER and TUKEL, JJ.

PER CURIAM.

In these consolidated appeals,[1] petitioner, Chris Jaye, appeals as of right orders of the probate court denying his petitions to terminate or modify respondent Karen Jaye's conservatorship and guardianship over their mother, Elaine Jaye, and allowing Karen's first annual account of the estate. We affirm.

## I. BACKGROUND

Elaine Jaye is 92 years old and the mother of three adult children, Chris Jaye, Karen Jaye, and Cindy Jaye. Prior to April 2014, Elaine lived with Chris, who served as her co-guardian, in Las Vegas, Nevada. She returned to Michigan in April 2014, and in June 2016, after contentious proceedings, Karen was appointed Elaine's sole guardian and conservator.

On August 7, 2017, Karen filed a petition to allow the first annual account. This included expenses totaling $39,928.91. Relevant to this case are expenses for "1/3 House—Utilities" in the amount of $5,755.91, $16,504.80 in "caregiving" paid to Karen's husband, $1,115.35 for "Restaurants," and $9,542.34 for "Misc."[2] Karen did not further itemize the accounting or provide receipts or documentation for the expenses. Chris objected to the accounting, arguing, among other things, that it was not properly itemized, the utilities were "exorbitant," and the "caregiving" expense was not supported by proper documentation.

Chris then filed a motion to modify the conservatorship and guardianship and requested that the probate court appoint professionals to fulfill both roles. In support of the conservatorship petition, Chris alleged that Karen's accounting was "incredibly vague and implausible" and that she had failed to make records available for his review. In support of the guardianship petition, Chris alleged that Karen refused to keep him apprised of Elaine's health, that he was concerned with the quality of care she was receiving, and that Karen was alienating Elaine against him and denying contact. On December 14, 2017, Karen filed a second account, which was materially the same but included a handwritten monthly ledger as well as voluminous documentation including bank statements, various bills, and receipts.

A hearing took place in the probate court on December 18, 2017. Chris argued that Karen should not include one-third of her mortgage as one of Elaine's household expenses, took issue with the "almost daily" grocery and restaurant receipts, and argued that the utilities expensed were exorbitant. He also alleged that Karen was refusing to pay Elaine's medical bills and that Karen's husband was not actually providing caregiving services as claimed in the accounting. He also alleged that Karen charged Elaine for one-half of a vacation home. For all of these reasons, Chris contended that the first annual account should be denied and that a professional third-party conservatorship was necessary.

---

[1] *In re Conservatorship of Jaye*, unpublished order of the Court of Appeals, entered February 5, 2018 (Docket Nos. 342195; 342197).

[2] The accounting also contained expenses for "personal care ($5,311), "pharmacy" ($807), insurance ($492.12), and repayment of a loan ($400).

According to Karen's counsel, Karen had taken a class to learn how to manage as a conservator and had been advised that one-third of the mortgage and one-third of utilities was standard. Counsel also stated that the amount charged for her husband's caregiving services was suggested to her by the Veterans Administration (VA), the source of the caregiving benefits. Karen denied charging Elaine for a vacation home. Her attorney further argued that hiring a third-party conservator would be costly and not in Elaine's best interests. Elaine's attorney testified that the account did not show any costs that were "out of the norm," and he stated that Elaine wanted Karen to remain her conservator.

The probate judge explained that he did not do his "own accounting" and that he would not "go through all of these bills to see whether they've been properly accounted for." He further acknowledged that at "a quick glance" some of the expenses raised "red flags," but he concluded that "things add up and that money has been accounted for" and that "things balance." He explained that he was accepting the first annual accounting "without ruling on whether or not any of these numbers are unreasonable." He explained that nothing in particular appeared to be facially fraudulent. Accordingly, the probate court denied the motion to modify the conservatorship.

Moving to the guardianship, Chris argued that Karen was denying him access to Elaine and that Karen would not allow Chris to talk to, see, or visit Elaine. Chris asserted that when Elaine called him on the phone over Thanksgiving, Karen and Cindy were "screaming and yelling obscenities in the background." According to Chris, he discovered through a third party that Elaine was in the hospital for an infection, but Karen would not answer her phone or let him know what was going on. As a result, Chris called the police to perform a wellness check. Chris asked that, at the very least, the probate court enter a visitation order.

Karen's attorney argued that Elaine wanted Karen to remain her guardian. He said that Chris was informed about Elaine's trip to the hospital and that it was Elaine, not Karen, who was limiting her own contact with Chris. The attorney referred to allegations of over-medication and abuse by Chris while Elaine was in Las Vegas with him, and, while acknowledging that they were unsubstantiated allegations, he explained that if Elaine "believes that they are true it certainly would explain her lack of desire to speak to the person she believes perpetrated these instances on her." He argued that the probate court should not order visitation against Elaine's wishes. Elaine's attorney also stated that the petition to remove Karen as guardian was without merit. He advised against a visitation order but recommended that if it were to be granted, visitation should be supervised.

The probate court asked an attorney appointed to represent Elaine in a trust case[3] to testify about what he knew about the situation. The attorney explained that he was appointed earlier that year and had visited Elaine at Karen's home on three or four occasions. He testified that Elaine was appropriately dressed and the house was clean. He said that Elaine was mentally "sharp" and "very attuned" to their conversations. According to the attorney, Elaine made it

---

[3] A separate case regarding the "Edward Jaye and Elaine Jaye Trust" was handled in another court.

"abundantly clear that she had wanted nothing to do with" Chris and that she did not wish to visit him. He said that she was happy and seemed to be doing well and that Karen was doing a "good job" as guardian. He admitted that he could not say with "100 percent" certainty that "there was no influence" from Karen, but he believed that Elaine was expressing decisions she had made on her own because he had spoken to her doctor, who advised him that Elaine had sufficient cognitive ability "to have a say."

The court concluded that there was insufficient evidence to modify the guardianship, finding that Karen was performing duties in a satisfactory manner and that it was in Elaine's best interests to continue with Karen as guardian. The probate court, however, encouraged Karen to allow visits with Chris and not to deny any visitation that Elaine requested.

## II. STANDARD OF REVIEW

A probate court's dispositional rulings are reviewed for an abuse of discretion, while the factual findings underlying the decision are reviewed for clear error. *In re Bibi Guardianship*, 315 Mich App 323, 328; 890 NW2d 387 (2016). An abuse of discretion occurs when the probate court "chooses an outcome outside the range of reasonable and principled outcomes." *Id*. at 329 (quotation marks and citation omitted). A finding of fact "is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

## III. DISCUSSION

### A. FIRST ANNUAL ACCOUNT AND CONSERVATORSHIP

We first conclude that the probate court did not abuse its discretion by allowing the first annual accounting and by denying the petition to modify the conservatorship.

Article V, Part 4 of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*., governs conservatorships. A conservator is the fiduciary of the protected individual and is subject to the same fiduciary duties and standards as those applicable to a trustee. MCL 700.5416. MCL 700.1212(1) provides:

> A fiduciary stands in a position of confidence and trust with respect to each heir, devisee, beneficiary, protected individual, or ward for whom the person is a fiduciary. A fiduciary shall observe the standard of care described in [MCL 700.7803[4]] and shall discharge all of the duties and obligations of a confidential

---

[4] MCL 700.7803 states:

> The trustee shall act as would a prudent person in dealing with the property of another, including following the standards of the Michigan prudent investor rule. If the trustee has special skills or is named trustee on the basis of representation of special skills or expertise, the trustee is under a duty to use those skills.

and fiduciary relationship, including the duties of undivided loyalty; impartiality between heirs, devisees, and beneficiaries; care and prudence in actions; and segregation of assets held in the fiduciary capacity. With respect to investments, a fiduciary shall conform to the Michigan prudent investor rule.

The probate court may appoint a conservator for an individual if it determines that the individual is unable to manage property and business affairs effectively because of mental deficiency and that the individual's property will be wasted or dissipated unless proper management is provided. MCL 700.5401(3). There is no dispute that Elaine requires a conservator.

However, Chris argues that the first annual accounting is deficient and should not be accepted and that therefore Karen should be removed as conservator. A "conservator shall expend or distribute money reasonably necessary for the support, education, care, or benefit of the protected individual." MCL 700.5425(b). The conservator must keep suitable records of the estate administration and exhibit those records on the request of an interested person. MCL 700.5417(2). Further, "[a] conservator shall account to the court for administration of the trust not less than annually . . . ." MCL 700.5418(1); see also MCR 5.409(C)(1). The accounting is subject to the requirements of MCR 5.310(C)(2)(c) and (d). MCR 5.409(C)(5). MCR 5.310(C)(2)(c) includes the following requirements:

> All accountings must be itemized, showing in detail receipts and disbursements during the accounting period, unless itemization is waived by all interested persons. A written description of services performed must be included or appended regarding compensation sought by a [conservator, see MCR 5.409(C)(5)]. This description need not be duplicated in the order. The accounting must include notice that (i) objections concerning the accounting must be brought to the court's attention by an interested person because the court does not normally review the accounting without an objection; (ii) interested persons have a right to review proofs of income and disbursements at a time reasonably convenient to the [conservator] and the interested person; (iii) interested persons may object to all or part of an accounting by filing an objection with the court before allowance of the accounting; and (iv) if an objection is filed and not otherwise resolved, the court will hear and determine the objection.

Chris argues that the probate court erred when it failed to scrutinize Karen's payments to her husband for caregiving and by not requiring detailed receipts, bills, contracts, or timekeeping records to demonstrate what caregiving services were rendered. According to the accounting, Elaine received $15,642.68 in VA benefits and Karen's husband received $16,504.80 from Elaine for caregiving services. Chris contends that Elaine is not receiving caregiving services and that Karen and her husband are wrongfully pocketing the VA benefits.

However, given the clear-error standard of review applicable to the probate court's findings of fact, we conclude that the probate court's findings should be affirmed on appeal. The $16,504.80 equates to approximately $45 per day for Elaine's care, which appears to be "reasonably necessary" for her support, care, and benefit. See MCL 700.5425(b). Further, nothing in the accounting suggests that Karen acted in bad faith or outside the limits of the law. See *In re Ansell Trust*, 224 Mich App 745, 748-749; 569 NW2d 914 (1997) (explaining that

fiduciaries should not be "liable for mere mistakes or errors of judgment where they have acted in good faith and within the limits of the law and the trust"). Although MCR 5.310(C)(2)(c) requires that "[a]ll accountings must be itemized," we hold that the probate court did not clearly err by finding that the "caregiving" designation was sufficient. The probate court's findings that everything was "accounted for" and balanced and that nothing appeared fraudulent do not leave this Court with a definite and firm conviction that a mistake has been made.

Chris next argues that Karen overcharged Elaine by $87.63 for July utilities without documentation. He also asserts that Karen "regularly charged 'miscellaneous entertainment' charges to Elaine" but did not provide adequate receipts or details. These charges included $64.50 in August, $71 in September, $88 in November, $79 in January, and $63 in February. He notes that these charges were in addition to other restaurant and personal expenses charged and that according to Chris, were in "amounts far greater than one would expect for a single elderly individual."

These are relatively minor amounts (less than $400 out of Elaine's expenses of approximately $40,000), and the probate court concluded that based on its review of the ledgers, everything was balanced and there was nothing fraudulent. Beyond his own opinion, Chris offers no support for his assertion that the amounts were unreasonable or excessive. Further, without a showing of bad faith, this Court should not hold Karen liable for "mere mistakes or errors of judgment." *Id.* As a result, the probate court did not clearly err by finding that the amounts were reasonable.

Chris also asserts that Elaine "provided the house to Karen at below its value with no mortgage, and the mortgage was taken out on the house solely for Karen's benefit," and he argues that Karen erroneously charged Elaine for one-third of the mortgage payment, approximately $375 to $400 per month. However, including one-third of the mortgage payment in Elaine's living expenses is not unreasonable because Elaine is one of three adults living in the home. Furthermore, Chris has provided no evidence to support his bare assertion that Elaine sold the home to Karen for a below-market price and took out a mortgage solely for her own benefit. A probate court's decision is reviewed on the record, *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008), and there is no record evidence to support Chris's assertion.

Next, Chris argues that Karen charged Elaine $315 in September for one-third of Karen's vacation home and $540.59 for one-third of "appliances," which were "yet more examples of Karen paying money from the estate directly to herself." Karen's ledger shows a one-time expense of $315 for one-half of a "vacation house" for "Lil Yellow Cottages," with the notation, "visit relatives."[5] We are not convinced that a one-time expense for a vacation rental was improper or unreasonable. And certainly nothing in the record shows that this expense was for a home owned by Karen. Furthermore, we conclude that the probate court's finding that the accounting was balanced and not fraudulent on its face was not clearly erroneous, and the one-

---

[5] In her brief on appeal, Karen explained that this was for a one-time cottage rental for a family reunion.

time expense for "1/3 Appliances" does not undermine that finding. Finally, Chris argues that Karen, in derogation of her conservator duties, refused to pay for Elaine's medical bills out of the conservatorship estate. However, evidence regarding any unpaid medical bills was not submitted. Therefore, Chris cannot prove how there is any error.

In summary, the expenses in the first accounting appeared to be "reasonably necessary" for Elaine's support, care, and benefit as required by MCL 700.5425(b). The probate court's findings that the various expenses were not fraudulent and that the account was balanced were not clearly erroneous. Although Chris desires more specific itemization, the accounting was broken down into eight total categories, and Karen submitted ledgers and voluminous receipts for various costs. While 100% of the costs may not have been accounted for, in the absence of bad faith or overreaching, we hold that the probate court's decision not to scrutinize every single expense was not clearly erroneous, and that its decision to allow the accounting was not an abuse of discretion because it was not outside the range of reasonable and principled outcomes.

Chris further argues that the probate court erred by denying his petition to remove Karen as conservator and to appoint an independent professional conservator. "A person interested in the welfare of an individual for whom a conservator is appointed may file a petition in the appointing court for an order to . . . [r]emove the conservator and appoint a temporary or successor conservator." MCL 700.5415(1). "The court may remove a conservator for good cause . . . ." MCL 700.5414. EPIC does not define "good cause," so this Court may consult a dictionary. See *Consumers Power Co v Dep't of Treasury*, 235 Mich App 380, 385; 597 NW2d 274 (1999). *Black's Law Dictionary* (10th ed) defines "good cause" as "[a] legally sufficient reason." See also *In re Utrera*, 281 Mich App 1, 11; 761 NW2d 253 (2008) (holding that "good cause" means a "legally sufficient or substantial reason").

Because we conclude that the probate court did not clearly err by finding that Karen substantially complied with her duties and that it did not abuse its discretion by allowing the first annual accounting, Chris's objections to her performance as conservator do not meet the definition of "good cause." Therefore, the probate court did not abuse its discretion when it denied Chris's petition to remove Karen as conservator because it was a reasonable and principled outcome. Furthermore, a professional conservator was not necessary because Karen was competent, suitable, and willing to serve as conservator. MCL 700.5106(2).

## B. GUARDIANSHIP

We conclude that the probate court's denial of Chris's petition to modify guardianship was not an abuse of discretion.

Article V, Part 3 of EPIC, MCL 700.5301 *et seq.*, governs the appointment of guardianships over incapacitated individuals (wards). An interested party may petition the probate court to terminate or remove a guardian. MCL 700.5310(2). "[T]o remove a guardian under MCL 700.5310, the probate court must find that the guardian is no longer suitable or willing to serve." *In re Redd Guardianship*, 321 Mich App 398, 407; 909 NW2d 289 (2017). A

"suitable" guardian means a person "who is qualified and able to provide for the ward's care, custody, and control." *Id*. at 408. "When a preponderance of the evidence weighs against the suitability of the ward's current choice for guardian, the probate court must remove that person as guardian." *Id*. at 414.

Chris argues that the circumstances that led to the guardian's removal in *Redd* also are present in this case. We disagree. In *Redd*, after an interested party filed a petition for removal of the guardian, the probate court held an evidentiary hearing at which 17 persons, including family members, a police officer, and several other unrelated persons, testified. *Id*. at 402. Of the 17 witnesses, 10 testified that the guardian was unduly influencing the ward against her family and preventing her from maintaining familial relationships. *Id*. Further, people who had previously advocated for the guardian changed course and alleged that he was unsuitable. *Id*. at 403. This Court affirmed the probate court's factual finding that the guardian was unsuitable. *Id*. at 413. It explained that even though the guardian was the ward's choice, his inability to provide for her social well-being, his unwillingness to facilitate family relationships, and his active obstruction of those relationships made him an unsuitable guardian. *Id*. at 412-413.

This case is not like *Redd*. Unlike in *Redd*, here there was no testimony or evidence that Karen was unduly influencing Elaine and impeding her relationship with Chris. Chris's allegations are based only on his own speculation about why Elaine does not wish to have contact with him. Moreover, Elaine's former attorney testified about interactions he had with Elaine previously that year. According to him, Elaine was mentally sharp and made it "abundantly clear that she wanted nothing to do with" Chris. This was the only testimony on the subject.

Further, Elaine's attorney testified that the petition to remove Karen as guardian was without merit and that there was no evidence to suggest that Karen was unfit to serve as guardian. He stated that Elaine had "benefitted" from the guardianship and that she was receiving proper care. He also noted that a wellness check performed at the request of Chris did not result in any report that Elaine was being mistreated. Elaine's former attorney testified that Elaine appeared "happy where she is" and that she "seemed to be doing well." He opined that he did not "see any concerns as to the function of the guardian," and that Karen was "doing a good job."

When a petition to remove a guardian is before the probate court, "particularly relevant evidence . . . include[s] (1) evidence on whether the guardian was still qualified and able, and (2) evidence on whether the guardian did, in fact satisfactorily provide for the ward's care, custody, and control in the past." *Id*. at 408. In this case, the evidence supported the conclusion that Karen remained qualified and able to perform as Elaine's guardian and that Karen had satisfactorily provided for the ward's care, custody, and control in the past. Although "[p]art of a guardian's responsibility is to provide for the ward's social well-being," *id*. at 413, beyond merely asserting that Karen was preventing him from having a relationship with Elaine, Chris provided no evidence that this was true. The record also indicated that Elaine called Chris on the phone the month before the hearing, which belies the assertion that Karen was hindering Elaine from contacting him.

The probate court's finding that Karen was a suitable guardian and had satisfactorily provided for Elaine's care, custody, and control was not clearly erroneous. Similarly, because Karen was suitable and willing to serve, the probate court did not err by refusing to appoint a professional guardian in her place. See *In re Guardianship of Gerstler*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 338935); slip op at 10 (holding that a professional guardian may not be appointed if there is another person with higher priority in MCL 700.5106 who is suitable and willing to serve).

Chris also cursorily argues that the probate court erred when it declined to appoint him as co-guardian, did not order that he be provided Elaine's health information, and did not enter a visitation order. Chris provides no support for his assertion that he must be apprised of Elaine's medical information. "It is axiomatic that where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court. And, where a party fails to cite any supporting legal authority for its position, the issue is deemed abandoned." *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999) (quotation marks and citation omitted). He similarly does not provide support for his contention that a visitation order was legally required or necessary. Furthermore, the probate court did explicitly instruct Karen to "make [visitation] happen when Elaine wants that to happen," but noted that Karen was under the obligation to act in Elaine's best interests. Finally, because the probate court did not abuse its discretion by denying Chris's petition for modification, it follows that it did not abuse its discretion when it declined to appoint Chris as co-guardian.

Affirmed.

/s/ Mark T. Boonstra
/s/ David H. Sawyer
/s/ Jonathan Tukel